Lloyd D. McDonald v. Commissioner. Estate of Clifford S. Stilwell (Charles J. Stilwell, Executor) v. Commissioner. Charles J. Stilwell v. Commissioner.
McDonald v. Commissioner
Docket Nos. 473, 474, 475.
United States Tax Court
1944 Tax Ct. Memo LEXIS 315; 3 T.C.M. (CCH) 274; T.C.M. (RIA) 44096; March 27, 1944
*315 Luther Day, Esq., for the petitioners. Lawrence R. Bloomenthal, Esq., for the respondent. LEECH
Memorandum Opinion LEECH, Judge: These consolidated proceedings involve gift tax deficiencies for the calendar years 1939 and 1940, as follows: Docket
No.
Petitioner
Year
Deficiency
473
Lloyd D. McDonald
1940
$7,074.08
474
Estate of Clifford S.
Stilwell
1939
101.25
1940
6,877.51
475
Charles J. Stilwell
1940
116.51
The Estate of Clifford S. Stilwell has stipulated the deficiency of $101.25 for the year 1939 and a deficiency of $40.30 for 1940 may be assessed against it notwithstanding our decision respecting the balance of the deficiency proposed for 1940. The sole issue involved is the value of certain shares of the common stock of The Warner & Swasey Company for gift tax purposes. The case was submitted upon a stipulation of facts with exhibits attached. The facts as stipulated are incorporated as findings of fact. We summarize the facts deemed material to the issue presented. [The Facts] The petitioners in Docket Nos. 473 and 475 are individuals. In Docket No. 474, the petitioner is the Estate of Clifford S. Stilwell, deceased. The individual petitioners *316 and the decedent filed their respective gift tax returns for the periods involved with the collector of internal revenue for the 18th district of Ohio, at Cleveland, Ohio. In October 1940, when the gifts in question were made, Charles J. Stilwell, 54 years of age, was president, Lloyd D. McDonald, 47, and the decedent, Clifford S. Stilwell, 51, were vice-presidents of The Warner & Swasey Company. All three were members of its Board of Directors, which consisted of 12 members. The Warner & Swasey Company, an Ohio corporation, succeeded to a business founded in 1880. It was principally engaged in the manufacture of turret lathes, tools and repair parts therefor. It also manufactured some astronomical instruments, other precision instruments and some special machinery. Until August 30, 1940, the Company was controlled by members of the families of Worcester R. Warner and Ambrose Swasey, its original founders. On that date each of its 248,695 shares of the par value $5 was converted into three shares of no par value, under a recapitalization plan. On the same day the Company and certain stockholders sold more than one-third of the then outstanding stock to underwriters for distribution *317 to the public. The underwriters paid $20.50 per share and sold the same to the public at $23 per share. The stock has since become widely distributed. Since 1917, the Company has from time to time sold shares of its stock at a fixed price, but subject to agreements that in the event of sale or upon the happening of certain contingencies the Company would have the primary right to repurchase these shares at the then book value. On January 19, 1939, the Company authorized the sale of not to exceed 9,000 shares to certain key officers and employees under options to be exercised prior to January 1, 1940. The sale price, in the event the option was exercised, was $12 per share for the $5 par value stock. The petitioners, Lloyd D. McDonald and Charles J. Stilwell, each purchased 1,000 shares and the decedent, Clifford S. Stilwell, purchased 1,500 shares. On January 20, 1940, the stockholders again approved the action of the Company's directors in offering an aggregate of 13,500 of the $5 par value common shares under similar restrictive option agreements, exercisable prior to January 1, 1941, to such officers and employees as the committee determined, at a fixed price of $13.50 per share. *318 These options were exercised by the individual petitioners and by the decedent. Lloyd D. McDonald purchased 1,200 shares, Charles J. Stilwell, 1,800 shares, and the decedent, 1,800 shares. These aforesaid optional purchasing agreements, set forth in full in the exhibits attached to the stipulation of the parties, provided, in substance, as follows: (a) The purchaser was not to sell, assign, transfer or dispose of the shares so purchased without first delivering to the company an irrevocable offer to sell the same, or any part thereof, to the company at a price equal to the book value on the last day of the calendar month next preceding date of receipt of the offer. (b) In case of resignation or discharge or termination of employment, or in the event of his death, a similar irrevocable offer was to be made to the company to purchase at book value likewise determined. (c) In the event the offer was not accepted and the shares purchased, the shares were released from all restrictions. (d) The restrictions and covenants were to bind successive purchasers, grantees or transferees. (e) The company was not obligated to either purchase or designate a purchaser of the stock so offered *319 to the company. (f) The stock certificates were to bear an endorsement showing they were subject to certain restrictions and limitations contained in the optional agreements under which the shares were purchased. The shares purchased and issued pursuant to the above optional agreements bore the required endorsement. On September 11, 1940, pursuant to authorization of the shareholders at a special meeting held on August 20, 1940, the optional agreements were modified. Thereafter in case of the death or the retirement, with the consent of the board of directors, after the employee reached 60 years of age, the Company had no such primary right to repurchase. A further modification permitted an employee to transfer his shares to his or her spouse or children, with the consent of the directors and upon the execution by such transferees of a restrictive agreement. During the month of October 1940, the petitioners, Lloyd D. McDonald and Charles J. Stilwell, were authorized to, and did, transfer by way of gift to their then respective spouses the shares of new no par stock which are the subject of the gifts in controversy. Also in that month the decedent, pursuant to authorization of *320 the directors, transferred by gift to his wife and his daughter certain shares of the new no par stock which are the subject of the gifts in controversy. All of the aforesaid transferees entered into restrictive agreements with the Company and deposited with the Company their certificates representing the shares duly endorsed in blank. The Company has since retained these certificates of stock in its possession. It is stipulated that the book value of the shares of common stock of Warner and Swasey on September 30, 1940 was $8.75 per share. Prior to August 30, 1940, there was no established market for any of the shares of the company. For some period prior thereto there had been substantially no sales of any shares except such shares as were sold to officers and employees under the aforesaid restrictive optional agreements. The sales price range of the common stock without par value, which was not subject to the restrictive agreements, on the over-the-counter exchange, varied from a high of 25 1/8 in November 1940 to a low of 7 1/2 in November 1943. During the month of October 1940, when the gifts in question were made, the highest price at which the unrestricted shares sold was *321 $23 per share and the lowest was $22 1/8 per share. The financial results of The Warner & Swasey Company operations during the years 1930 to 1941, inclusive, are reflected in the following schedule: Common
Cash
Cash
Shares
Dividend
Dividends
Out-
on
on
standing
Net Profit
Preferred
Common
at end of
Net Sales
(Loss)
Stock a
Stock
Period d
1930
$ 3,000,651.31
$ 63,141.30 $0
$ 283,670.50
$919,214
1931
1,102,205.90
(507,635.17)
0
116,669.75
918,232
1932
375,748.96
(422,858.23)
0
1,345.60
900,000
1933
733,510.62
(58,311.93)
0
0
900,000
1934
1,646,107.57
221,311.57
0
0
900,000
1935
2,854,704.65
415,510.15
c 83,543.00
65,622.00
719,100
1936
5,659,158.98
1,101,564.35
83,322.00
143,557.00
717,240
1937
9,126,828.25
b 1,930,846.72
83,239.50
230,946.00
682,380
1938
5,834,975.19
b 811,361.21
83,176.67
227,460.00
682,380
1939
9,237,082.01
1,864,553.28
82,596.78
942,548.50
709,080
1940
19,027,258.99
3,371,283.11
60,759.00
1,468,824.90
803,135
1941
34,903,703.40
3,929,859.10
0
1,633,030.00
816,635
10-yr. ave.
1930-1939
3,957,097.34
541,948.33
41,587.80
201,181.94
804,763
10-yr. ave.
1931-1940
5,559,758.11
872,762.51
47,663.70
319,697.38
793,155
10-yr. ave.
1932-1941
8,939,907.86
1,316,511.93
47,663.70
471,333.40
782,995
*322 Earn-
ings
Cash
per
Divi-
Share
dends
after
per
Pre-
Share
ferred
on Com-
Divi-
mon
dends
Shares
1930
$ .069
$ .309 1931
(.553)
.127 1932
(.470)
.0015
1933
(.065)
1934
.246
1935
.462
.091 1936
1.420
.200 1937
2.708
.338 1938
1.067
.333 1939
2.513
1.329 1940
4.197
1.933 1941
4.812
2.000 1941
10-yr. ave.
1930-1939
.622
.250 1931-1940
1.040
.403 10-yr. ave.
1932-1941
1.621
.602 *323 The decision here is governed by our determination of the factual question of value of the restricted shares of no par value of The Warner & Swasey Company on the dates of respective gifts in October 1940. The stipulation of the parties renders it unnecessary for us to consider the 1939 value of these shares. The respondent based the deficiencies on his determination that the stock, on the critical dates, had a fair market value of $23 per share. This figure is the price at which the unrestricted shares of no par value common stock of said company were selling on the over-the-counter market on those dates. The taxpayers, in their respective gift tax returns, used the stipulated book value of $8.75 per share. This figure is sought to be justified on the ground that the particular shares in question were purchased under optional agreements containing restrictions and limitations upon the sale, transfer or other disposition of the shares. The particular restriction germane here was the requirement that in case the holder desired to sell, he was first required to offer them to the corporation at the book value of the stock at the close of the month preceding the offer. We are convinced *324 that neither the price used by the respondent nor the taxpayers reflects the fair market value of the shares for the purpose of determining the gift tax liability thereon. See Worcester County Trust Co. et al., Executors, v. Commissioner, 134 Fed. (2d) 578; Kline v. Commissioner, 44 B.T.A. 1052; affd., 130 Fed. (2d) 742; cert. denied, 317 U.S. 697. Section 1005 of the Internal Revenue Code provides that where a gift is made in property "the value thereof at the date of the gift shall be considered the amount of the gift." [1]
It has been stipulated there were no actual sales or bid and asked prices available for the restricted no par value common shares of the capital stock of The Warner & Swasey Company. Therefore, we are required to consider all relevant factors affecting fair market value. Worcester County Trust Company et al., Executors, v. Commissioner, supra. It has been judicially recognized that although such restrictive agreements as are involved here do not, as a matter *325 of law, affect the fair market value of that with which they are concerned, they may in fact do so. [2] No expert testimony of valuation was offered but the parties have stipulated all the relevant data. The record contains a history of the company, the character of its business, book value, earnings, dividend paying record, the sales price of the unrestricted shares, the purchase price which underwriters were willing to pay for approximately one-third of the outstanding shares of said no par value stock, and the relation of the donors to its management. It appears that certain underwriters, skilled in the valuation of securities, in August 1940 purchased a large block of the unrestricted shares of the no par common stock from the company and certain of its stockholders at a price of $20.50 par. In the critical month of October these shares were sold to the public at $23. It may be that the public was somewhat influenced by the fact that the company was obviously benefiting from war conditions. We, however, believe that the underwriters based their offer upon all the relevant factors of valuation. That the underwriters were willing to pay $20.50 a share for the unrestricted shares *326 is rather persuasive that the fair market value was considerably in excess of the book value of the shares. It does not, however, determine the market value of the restricted shares. Obviously it is impossible to determine this value with mathematical accuracy but that difficulty does not relieve us of the duty of finding the reasonably approximate value. Guggenheim v. Helvering, 117 Fed. (2d) 469. We think the evidence here is sufficient upon which to base such finding. Cf. Taylor v. Helvering, 293 U.S. 507. Accordingly, giving due consideration and effect to the restrictions upon the sale of the stock in question and all other relevant factors bearing upon valuation, we think that the restricted shares of the no par common stock of The Warner & Swasey Company had a value for gift tax purposes of approximately $14 per share in October 1940, when the gifts involved here were made. Decisions will be entered under Rule 50. Footnotes
a. Parentheses denote losses. Preferred Stock of the Company was issued during the year 1933 in exchange for twenty-five year 6% gold notes due April 1, 1953. It was retired in 1940. ↩
d. The number of shares of Common Stock actually outstanding at the end of each period has been adjusted to give effect to changes in such shares since April 30, 1928, including the changing of each share of Common Stock par value $5.00 per share, outstanding at June 30, 1940, into three shares of Common Stock without par value.↩
c. These dividends were declared out of capital surplus. ↩
b. Dividends received by the Company from its unconsolidated subsidiary from date of acquisition (November 1, 1938) to December 31, 1938, were $2,860.30 in excess of its proportionate interest in the earnings of the subsidiary for that period. The Company's proportionate interest in the earnings of such subsidiary, in excess of dividends received, not taken up as income for the year 1939 and the period of six months ended June 30, 1940, was $11,155.93 and $20,097.64, respectively. ↩
1. See also Treasury Regulations 108, Section 86.19↩.
2. Worcester County Trust Company et al., Executors v. Commissioner, supra.↩